IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Larry R. Caldwell,

      Plaintiff,

      v.                    Case No. 2:11-cv-182

The PNC Financial Services
Group, Inc., et al.,

      Defendants.


OPINION AND ORDER

      This is an action filed by plaintiff Larry R. Caldwell against
PNC Financial Services Group, Inc., and PNC Bank (collectively
"PNC"), the National City Corporation Amended and Restated
Management Severance Plan ("the Plan"), Kerry Allen, a Plan
administrator, and John Does 1-10.  Plaintiff alleges that he was
an employee of National City Bank ("National City") as of December
3, 2008, when PNC acquired National City in a change of control.
Complaint, ¶¶ 23-24.  Plaintiff further alleges that he was a
participant in the Plan.  Complaint, ¶ 6.  The Plan, attached as
Exhibit A to defendants' motion to dismiss, became effective on
January 1, 2005, and was amended effective September 30, 2008.  The
Plan was designed to provide severance benefits to certain National
City employees in the event National City was acquired by another
entity.

      Plaintiff contends that following PNC's acquisition of
National City, plaintiff was assigned to three branches, two of
which were located in financially depressed areas of Columbus,
Ohio.  Complaint, ¶ 25.  Plaintiff alleges that PNC made no
allowance for the viability of plaintiff's territories in setting

his loan goals, which were based on plaintiff's salary. Complaint, ¶ 26. Plaintiff alleges that he was given a formal warning in April of 2009 for failing to meet his loan goals, and that he was given a second warning and placed on a performance improvement plan in July of 2009. Complaint, ¶¶ 27, 29. Plaintiff contends that in May and June of 2009, PNC realigned the territories of employees who occupied positions similar to that held by plaintiff, but did not grant plaintiff's request to assign him additional territories. Complaint, ¶ 28. Plaintiff alleges that he was given a third warning on August 12, 2009, and that Ron Byers requested that plaintiff voluntarily resign from his employment. Complaint, ¶¶ 30-31. Plaintiff alleges that he was given a fourth warning on August 27, 2009, and that his supervisor, Don Guilbert, requested that plaintiff resign and told him that if he did not, he would be placed on probation effective September 1, 2009. Complaint, ¶¶ 32-33. Plaintiff was placed on probation on December 10, 2009, but despite the fact that plaintiff's loan goals were not met, PNC did not terminate plaintiff's employment. Complaint, ¶¶ 44-49. Plaintiff resigned from his position effective January 29, 2010. Doc. 7, Ex. B.

After his resignation, plaintiff sought to recover severance benefits from the Plan, contending that he had been constructively discharged. Complaint, ¶¶ 51-53. The Plan denied plaintiff's claim for benefits, and plaintiff's appeal from that decision was denied. Doc. 7, Ex. F. Plaintiff then filed his complaint in the instant case. In Count 1 of the complaint, plaintiff asserts a claim for breach of contract due to the denial of severance benefits. Count 2 advances a claim of age discrimination under Ohio Rev. Code Chapter 4112. Count 3 asserts a claim for benefits

under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132(a)(1)(B). Count 4 asserts that PNC acted with the intent to interfere with plaintiff's rights under the Plan in violation of 29 U.S.C. §1140. In Count 5, plaintiff alleges that the defendants failed to grant his request for Plan documents in violation of 29 U.S.C. §1132(c). This matter is before the court on the motion of defendants to dismiss Counts 1, 3, 4 and 5 of the complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief may be granted.

I. Standards for a Rule 12(b)(6) Motion

In ruling on a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in a light most favorable to the plaintiff, accept all well-pleaded allegations in the complaint as true, and determine whether plaintiff undoubtedly can prove no set of facts in support of those allegations that would entitle him to relief. Erickson v. Pardus, 551 U.S. 89, 94 (2007); Bishop v. Lucent Technologies, Inc., 520 F.3d 516, 519 (6th Cir. 2008); Harbin-Bey v. Rutter, 420 F.3d 571, 575 (6th Cir. 2005). To survive a motion to dismiss, the "complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." Mezibov v. Allen, 411 F.3d 712, 716 (6th Cir. 2005). Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice. Id.

While the complaint need not contain detailed factual allegations, the "[f]actual allegations must be enough to raise the claimed right to relief above the speculative level," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must create a reasonable expectation that discovery will reveal evidence to

support the claim. <u>Campbell v. PMI Food Equipment Group, Inc.</u>, 509 F.3d 776, 780 (6th Cir. 2007). A complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." <u>Twombly</u>, 550 U.S. at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 129 S.Ct. 1937, 1949 (2009). Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. <u>Id</u>. Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Id</u>. at 1950. Where the facts pleaded do not permit the court to infer more than the mere possibility of misconduct, the complaint has not shown that the pleader is entitled to relief as required under Fed.R.Civ.P. 8(a)(2). <u>Ibid</u>.

In evaluating a motion to dismiss, a court generally is limited to the complaint and exhibits attached thereto. <u>Amini v. Oberlin College</u>, 259 F.3d 493, 502 (6th Cir. 2001). Most materials outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss unless the motion is converted to one for summary judgment under Fed.R.Civ.P. 56. <u>Jackson v. City of Columbus</u>, 194 F.3d 737, 745 (6th Cir. 1999), <u>abrogated on other grounds</u>, <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506 (2002); <u>Weiner v. Klais & Co., Inc.</u>, 108 F.3d 86, 88 (6th Cir. 1997). However, the court may consider a document or instrument which is attached to the complaint, or which is referred to in the complaint and is central to the plaintiff's claim. Fed.R.Civ.P. 10(c)("[a] copy of any

4

written instrument which is an exhibit to a pleading is a part thereof for all purposes"); <u>Weiner</u>, 108 F.3d at 89.

Plaintiff does not oppose defendants' motion to dismiss Count 5 of the complaint. Accordingly, Count 5 will be dismissed.

## II. Count 1 - Breach of Contract

Defendants argue that plaintiff's state law breach of contract claim should be dismissed because it is preempted by ERISA. Under 29 U.S.C. §1144(a), ERISA supersedes "any and all State laws insofar as they may now or hereafter relate to an employee benefit plan." §1144(a). "Any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." <u>Aetna Health Inc. v. Davila</u>, 542 U.S. 200, 209 (2004). The Sixth Circuit has noted that "virtually all state law claims relating to an employee benefit plan are preempted by ERISA." <u>Cromwell v. Equicor-Equitable HCA Corp.</u>, 944 F.2d 1272, 1276 (6th Cir. 1991)(holding that plaintiffs' breach of contract claim for failure to pay plan benefits was preempted by ERISA).

Plaintiff argues in response that his breach of contract claim is not preempted because the Plan is not an ERISA employee welfare benefit plan.[1] The definition of an employee welfare benefit plan includes a plan established or maintained by an employer for the

_____

[1]Paragraph 73 of the complaint states, "The Plan is a welfare plan governed by ERISA." Defendants argue that plaintiff is bound by this statement as an admission. <u>See</u> <u>Shell v. Parrish</u>, 448 F.2d 528, 530 (6th Cir. 1971). However, plaintiff stated at the beginning of his complaint that he was asserting a claim under state law as well as ERISA claims because he anticipated a dispute concerning whether the Plan was an ERISA plan. Complaint, ¶ 3. Plaintiff is entitled to plead claims for relief in the alternative. Fed.R.Civ.P. 8(a)(3). While paragraph 73 might be an admission for purposes of the ERISA claim, the court will not consider paragraph 73 as an admission for purposes of the preemption issue.

purpose of providing "(A) benefits in the event of ... unemployment ... or (B) any benefit described in section 186(c) of this title." 29 U.S.C. §1002(1).  Since 29 U.S.C. §186(c) refers to severance benefits, the Sixth Circuit has held that severance plans are included in the definition of 29 U.S.C. §1002(1)(B).  <u>See</u> <u>Shahid v. Ford Motor Co.</u>, 76 F.3d 1404, 1409 (6th Cir. 1996).  The Supreme Court has also held that "plans to pay employees severance benefits, which are payable only upon termination of employment, are employee welfare benefit plans." <u>Massachusetts v. Morash</u>, 490 U.S. 107, 116 (1989).

However, the Sixth Circuit has held that not all severance pay plans are ERISA plans.  <u>Swinney v. General Motors Corp.</u>, 46 F.3d 512, 517 (6th Cir. 1995).  In order to determine whether a severance plan is an ERISA plan, the court "must look to the nature of the plan itself." <u>Kolkowski v. Goodrich Corp.</u>, 448 F.3d 843, 848 (6th Cir. 2006).[2]  An employee benefit program is regulated by ERISA only if it is administered through a "plan, fund, or program" established to provide benefits under any of the covered categories.  <u>Sherrod v. General Motors Corp.</u>, 33 F.3d 636, 638 (6th Cir. 1994).  In determining whether a "plan, fund, or program" exists, a court should focus on whether the employee benefit requires an administrative scheme to execute.  <u>Id.</u>  "The hallmark of an ERISA benefit plan is that it requires 'an ongoing

---

[2]The fact that the Plan provides that "[t]he validity, interpretation, construction and performance of this Plan will be governed by and construed in accordance with the substantive laws of the State of Delaware" is not conclusive. "It is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit." <u>Cromwell</u>, 944 F.2d at 1276.  This court may consider both federal common law and state law contract principles in interpreting an ERISA plan, <u>see</u> <u>Perez v. Aetna Life Ins. Co.</u>, 150 F.3d 550, 556 (6th Cir. 1998), and may take the drafters' preference that the Plan be construed in accordance with Delaware law into account.

administrative program to meet the employer's obligation.'" _Swinney_, 46 F.3d at 517 (quoting _Fort Halifax Packing Co. v. Coyne_, 482 U.S. 1, 11 (1987)). The factors employed by the Sixth Circuit to determine if a severance agreement plan meets the _Fort Halifax_ criteria are: 1) whether the employer has discretion over the distribution of benefits; and 2) whether there are on-going demands on an employer's assets. _Kolkowski_, 488 F.3d at 848.

In regard to the first factor, employer discretion, a court considers whether the plan administrator made individualized determinations of eligibility, as opposed to those that require automatic or simple decisions. _Id._ Simple or mechanical determinations regarding the distribution of benefits do not satisfy the first factor. _See_ _Cassidy v. Akzo Nobel Salt, Inc._, 308 F.3d 613, 616 (6th Cir. 2002); _Nelson v. General Motors Corp._, 156 F.3d 1231 (table), 1998 WL 415993 at *3 (6th Cir. July 7, 1998)(severance plan was not an ERISA plan where the amount of benefits was pre-determined through the collective bargaining process and employer did not exercise any discretion in executing the plan or determining the eligibility of employees to participate). However, "if to determine benefits the employer must "analyze each employee's particular circumstances in light of the appropriate criteria,' the severance plan is probably an ERISA plan." _Cassidy_, 308 F.3d at 616 (quoting _Sherrod_, 33 F.3d at 639-39).

As to the second factor, whether benefits create on-going demands on employer assets, a plan may be an ERISA plan if the employer "assumes ... responsibility to pay benefits on a regular basis, and thus faces ... periodic demands on its assets that create a need for financial coordination and control." _Fort_

<u>Halifax</u>, 482 U.S. at 12. While a one-time lump sum distribution of severance benefits is not consistent with an ERISA plan, <u>Sherrod</u>, 33 F.3d at 639, the Sixth Circuit has held that plans which permitted employees to choose between a lump sum payment and a continued salary over a period of time, <u>see</u> <u>Cassidy</u>, 308 F.3d at 616-17, or which provided for ongoing medical, dental and life insurance benefits in addition to a lump sum payment, <u>see</u> <u>Kolkowski</u>, 448 F.3d at 848, were sufficient to satisfy the second prong.

In <u>Toohig v. PNC Financial Services Group, Inc.</u>, No. 1:10 CV 657 (unreported), 2010 WL 48244530 (N.D.Ohio Nov. 19, 2010), the court held that the same severance plan at issue in the instant case met the requirements for an ERISA plan. This court agrees that the plain language of the Plan is sufficient to support the determination that the Plan is an employee welfare benefit plan governed by ERISA.

The Plan states that its purpose is "to maximize the Corporation's [National City's] profitability and operating success by attracting and retaining key managerial, operational and executive employees and allowing them to focus on their responsibilities in the event of, and following, a Change in Control." Plan, §1.2. The Plan grants severance benefits to employees who are terminated by the "Surviving Entity" (in this case, PNC) during the "Protection Period." The "Protection Period" is defined as the period of time between the "Effective Date" (the date uninterrupted discussions or negotiations leading to the change in control commenced) and the fifteen-month anniversary of the implementation of the change in control. Plan, §2.1(i),(m), (u). In this case, plaintiff alleges that the change in control

occurred on or about December 31, 2008, and the fifteen-month period concluded on or about March 31, 2010.

Plaintiff argues that this time limitation on the duration of the Plan weighs against it being an ERISA plan. However, even a plan of short duration can potentially require a significant level of administrative oversight. In this case, the participants in the Plan include any employees "whose job is assigned to a grade level within the range of grade level 1 through grade level 7" except for certain employees who are covered by an employment agreement, severance agreement, or other specialized plan. Plan, §2.1(r). The term "employee" includes individuals employed on a full time, part time or salaried basis. Plan, §2.1(j). Thus, the Plan contemplates participation by a broad spectrum of employees.

The Plan provides that the Plan shall be administered by the Compensation and Organization Committee of the Board or another committee appointed by the Board to serve as the administering committee of the Plan. Plan, §2.1(e); Article 14. If PNC fails to pay severance compensation, a participant may make a claim for severance benefits by submitting a written request to the Committee. Plan, §5.1. The Committee must review the claim and either approve or deny it. Plan, §5.2. The Plan also provides for an appeal from the Committee's determination. Plan, §§5.4-5.5.

The Committee must determine whether the employee is a "participant" who is eligible for benefits. The Committee must learn whether the employee is assigned to a grade level 1 through 7, and whether the employee is covered by another employment agreement, severance agreement or other specialized plan which would preclude him from being a participant. See Plan, §2.1(r). Under §3.1 of the Plan, a participant is entitled to benefits if

PNC terminates the participant's employment during the Protection Period, unless the participant is terminated for cause. The term "Cause" is defined as the termination of employment due to: an intentional act of fraud, embezzlement or theft in connection with the participant's employment; intentional wrongful damage to the employer's property; intentional wrongful disclosure of proprietary information; intentionally engaging in competitive activity which materially harmed the employer; an order from a federal or state regulatory agency mandating the termination of the participant's employment; or conviction of a criminal offense involving dishonesty, breach of trust, money laundering, or illegal drug trafficking. Plan, § 2.1(c). Under §3.2 of the Plan, a participant is entitled to benefits when the participant resigns his employment where the participant has incurred a reduction in his base salary, or where PNC requires the participant to change his principal location of work to a location in excess of fifty miles away from his principal location of work immediately prior to the change in control. This eligibility determination requires looking at the particular circumstances of each employee. See Sherrod, 33 F.3d at 638 ("employer's need to create an administrative system may arise where the employer, to determine the employees' eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria")(quoting Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 257 (8th Cir. 1994)).

The Plan also requires the Committee to make benefit calculations that go beyond mere simple or mechanical determinations. The Plan provides for bi-weekly payments for a year, consisting of adding the participant's base salary and

10

incentive pay, divided by twenty-six. Plan, §4.1(a). To determine a participant's base salary, the Committee must ascertain the participant's annual salary, less any bonuses, incentive pay, special awards, stock options or other stock compensation. Plan, §2.1(a). The calculation of incentive pay also entails a complex examination of numerous factors in each participant's employment history.[3]

The Plan also provides for a lump sum payment equal to the participant's base salary multiplied by .25 in lieu of employee benefits. Plan, §4.1(b). The term "Employee Benefits" is defined to include benefits from "any and all employee retirement income and welfare benefit policies, plans, programs or arrangements in which the Participant is entitled to participate" including stock options, stock purchases, stock appreciation, savings, pension, retirement income or welfare benefit, deferred and incentive compensation, insurance, and expense reimbursement. Plan, §2.1(k).

---

[3] The term "Incentive Pay" means:

[A]n amount equal to the sum of (a) the higher of (i) the highest aggregate annual incentive payment (excluding income realized from the exercise of stock options, any benefits received from being granted stock options or shares of restricted stock, income realized from the sale of restricted stock and any profit sharing, matching contributions or discretionary contributions made under any savings plan but including, without limitation, awards pursuant to the Management Incentive Plan) awarded for either of the two calendar years immediately preceding the year in which the Effective Date occurs or (ii) the target award for the individual for the year in which the Effective Date occurs and (b) the higher of (i) the highest incentive payment awarded pursuant to the Long Term Plans for either of the plan cycles ending in the two calendar years immediately preceding the year in which the Effective Date occurs or (ii) the target award for the individual pursuant to the Long Term Plans for the plan cycle ending in the calendar year in which the Effective Date occurs. For purposes of this Paragraph 2.1(o), "payment" includes moneys paid as well as any portion of any award deferred.

Plan, §2.1(n).

Thus, the Committee is required to examine each employee's circumstances and determine the retirement and insurance programs in which the employee participates to calculate the lump sum benefit.

The Plan further provides that the "Committee shall have full power and authority to interpret, construe and administer this Plan" and further that "its interpretations and construction hereof, and actions hereunder, including the timing, form, amount or recipient of any payment to be made hereunder, shall be binding and conclusive on all persons for all purposes." Plan, Article 14. "The degree of discretion retained by the employer over distribution of benefits is one important factor in deciding whether a severance plan is an ERISA plan." Cassidy, 308 F.3d at 616. Article 14 confers substantial discretion over the distribution of benefits to the Committee. The first prong of the Kolkowski test is met here.

The second prong is also satisfied in this case, as the Plan makes ongoing demands on PNC's assets. The Plan provides for bi-weekly payments for a year, in addition to the lump sum payment in lieu of employee benefits. Plan, §4.1(a) and (b). The Plan also provides that a participant's termination will not affect any rights which the participant may have under the terms of any other agreement or policy provided by PNC. Plan, §3.3. Participants receiving financial counseling prior to the change in control continue to receive financial counseling services during the protection period. Plan, §2.1(k), (u). The ongoing nature of the demands on PNC's assets contemplated by the Plan is further indicated by the fact that the Plan affords participants the right to appeal the denial of benefits, and successful appellants may

gain the right to the payment of severance benefits beyond the one-year anniversary of the termination of the protection period. The second branch of the Kolkowski test is met in this case.

Plaintiff has pleaded no facts which contradict the terms of the Plan, or which would indicate that the Plan is not an ERISA plan. The court concludes that plaintiff's state law breach of contract claim is preempted by ERISA, and defendants' motion to dismiss Count 1 is granted.

III. Count 3 - ERISA Claim for Benefits

A. Motion to Dismiss PNC, Allen, and John Doe Defendants

In Count 3, plaintiff asserts a claim for severance benefits under the terms of the plan pursuant to §1132(a)(1)(B). Defendants argue that defendants PNC, Allen, and the John Doe defendants should be dismissed as to Count 3 because the Plan is the only proper defendant to this claim. The proper defendant in an ERISA action concerning benefits is the plan administrator. See Riverview Health Institute LLC v. Medical Mutual of Ohio, 601 F.3d 505, 522 (6th Cir. 2010). Nominal designation as a plan administrator is not sufficient in this context. Rather, an entity, such as an employer, is not a proper party defendant in an action concerning benefits unless the employer "'is shown to control administration of the plan.'" Gore v. El Paso Energy Corp. Long Term Disability Plan, 477 F.3d 833, 842 (6th Cir. 2007)(quoting Daniel v. Eaton Corp., 839 F.2d 263, 266 (6th Cir. 1988)); Moore v. Lafayette Life Insurance Co., 458 F.3d 416, 438 (6th Cir. 2006).

Article 14 of the Plan states that "this Plan shall be administered by the Committee." PNC is not a Plan administrator, and would ordinarily not be a proper party to plaintiff's claim for

benefits. However, PNC would arguably be liable under §5.6 of the Plan to pay plaintiff's reasonable attorneys' fees and costs in the event that plaintiff would prevail on his claim for benefits. In the absence of additional information and argument, dismissal of PNC on this ground would be premature, and PNC's motion to dismiss Count 3 against the PNC entities on this ground is denied.

In regard to defendant Allen, the complaint contains the conclusory allegation that Allen is "a Plan Administrator" and "an employee of PNC." Complaint, ¶ 11. Even assuming that Allen holds the title of "Plan Administrator," the mere fact that a person holds an office or position within a plan does not make that person a fiduciary. 29 C.F.R. §2509.75-8, Q&A D-3. A holder of an office or position of an employee benefit plan would be a plan fiduciary if that person "has the final authority to authorize or allow benefit payments in cases where a dispute exists as to the interpretation of the plan provisions relating to eligibility for benefits." Id. Under the Plan, the term "Committee" is defined as "the Compensation and Organization Committee of the Board or another committee appointed by the Board to serve as the administering committee of the Plan." Plan, §2.1(e). The Committee is responsible for making the final decision regarding eligibility for Plan benefits. Plan, §5.5. The complaint fails to allege sufficient facts to support a claim under §1132(a)(1)(B) against defendant Allen, and the motion to dismiss him as a defendant on this claim is well taken.

In regard to the John Doe defendants, plaintiff alleges that the John Doe defendants were members of the Committee. They might arguably be proper defendants to this claim as members of the entity responsible for making final decisions under the Plan. See

14

<u>Bendaoud v. Hodgson</u>, 578 F.Supp.2d 257, 275 (D. Mass. 2008)(members of Plan committee who exercised discretionary authority in managing plan's assets were properly named fiduciary defendants). Defendants' motion to dismiss the John Doe defendants on this ground is denied.

## B. Sufficiency of §1132(a)(1)(B) Claim

Defendants have also moved to dismiss Count 3 for failure to state a claim for relief. Defendants argue that plaintiff has failed to plead facts sufficient to show that he is a participant entitled to benefits under the Plan because he has not alleged that his employment was terminated without cause by PNC or that he resigned following a reduction in base salary or a change in job location, as required under §§3.1 and 3.2 of the Plan. Plaintiff does not dispute that he resigned his employment effective January 29, 2010. However, he argues that he was constructively discharged by PNC due to the alleged acts of the defendants, and that this constructive discharge constituted termination by PNC within the meaning of the Plan. Although the theory of constructive discharge is well accepted in the quasi-tort context of employment discrimination actions, plaintiff's claim for benefits under §1132(a)(1)(B) is a contract claim, and the validity of that claim depends on the terms of the Plan.

Article 3 of the Plan states that "[i]n the event the Surviving Entity terminates the Participant's employment during the Protection period, the Participant will be entitled to the severance compensation provided by Article 4[.]" Plan, §3.1. Article 3 then specifies three circumstances in which a participant whose employment is terminated by the Surviving Entity is not entitled to benefits: the participant dies prior to the termination

of employment; the participant becomes permanently disabled prior to termination of employment; and participant's employment is terminated for "cause" as defined in §2.1(c) of the Plan. Plan, §3.1(c). The Plan further provides:

> The Participant may terminate employment with the Surviving Entity during the Protection Period with the right to severance benefits as provided in Article 4 upon the occurrence of one or more of the following events (regardless of whether any other reason for such termination exists or has occurred, including without limitation other employment):
>
> (a) A reduction in the Participant's Base Salary; or
>
> (b) The Surviving Entity of the Participant requires the Participant to have his principal location of work changed, to any location which is in excess of 50 miles from the location thereof immediately prior to the Change in Control.

Plaintiff has alleged no facts showing that either of these employment actions occurred in his case.

The record indicates that plaintiff pursued an appeal from the denial of severance benefits to the Plan's Appeal Committee. The Committee noted §3.2 of the Plan and concluded that plaintiff "is not eligible for benefits under the Plan because he resigned his position when he submitted a letter of resignation on January 29, 2010, and neither of the events in Section 3.2 occurred." Doc. 7, Ex. D. Counsel for plaintiff then sent a letter to the Appeal Committee dated June 16, 2010, in which he advanced the constructive discharge theory and set forth the alleged circumstances which he argued supported that theory. Doc. 7, Ex. E. The Appeal Committee then conducted a second level review of plaintiff's claim and affirmed the denial of benefits by letter dated July 27, 2010. Doc. 7, Ex. F. The Appeal Committee noted

that plaintiff did not contend that either of the circumstances described in §3.2 of the Plan were present, and that plaintiff acknowledged that he resigned from his employment effective January 29, 2010. Ex. F., p. 2. The decision states: "While you suggest that Mr. Caldwell was constructively discharged during the protection period and thus forced to terminate his employment, the Plan does not provide for severance benefits in the case of a voluntary or constructive discharge except [in the case of a reduction in base salary or a change in work location in excess of fifty miles]." Ex. F, p. 2. The Appeal Committee determined that plaintiff "voluntarily terminated employment with National City/PNC under circumstances that do not entitle him to severance benefits under the explicit terms of the Plan." Ex. F, p. 2.

Under ERISA, every employee benefit plan must be established and maintained pursuant to a written instrument specifying the basis on which payments are to be made from the plan. 29 U.S.C. §§1102(a)(1) and 1102(b)(4); <u>Kennedy v. Plan Administrator for DuPont Savings and Investment Plan</u>, 555 U.S. 285, 300 (2009). The plan administrator is obliged to act in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of ERISA. 29 U.S.C. §1104(a)(1)(D). A plaintiff's claim under §1132(a)(1)(B) "therefore stands or falls by 'the terms of the plan[.]'" <u>Kennedy</u>, 555 U.S. at 300 (quoting §1132(a)(1)(B)).

Federal common law rules of contract interpretation apply in construing an ERISA plan, and a plan's provision must be interpreted "according to their plain meaning, in an ordinary and popular sense." <u>Perez</u>, 150 F.3d at 556. Courts are not permitted to rewrite contracts by adding additional terms. <u>Id.</u> at 557. In

developing federal common law rules of contract interpretation, courts take direction from both state law and general contract law principles. Id. at 556.

The Plan in this case states that the "validity, interpretation, construction and performance of this Plan will be governed by and construed in accordance with the substantive laws of the State of Delaware." Plan, Article 12. Thus, in addition to applying the federal common law of ERISA, this court will look for guidance to Delaware law. Under both federal and Delaware law, the interpretation and construction of a contract is a matter of law for the court. See Detroit Radiant Products Co. v. BSH Home Appliances Corp., 473 F.3d 623, 627 (6th Cir. 2007); Paul v. Deloitte & Touche, LLP, 974 A.2d 140, 145 (Del. 2009). Under Delaware law, a contract's construction should be that which would be understood by an objective, reasonable third party. Osborne ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159 (Del. 2010). When a contract is clear and unambiguous, courts will give effect to the plain meaning of the contract's terms and provisions. Id. at 1159-60. If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity. Eagle Industries, Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1232 (Del. 1997). Absent some ambiguity, Delaware courts will not destroy or twist contract language under the guise of construing it. Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1195 (Del. 1992). A party will be bound by the plain meaning of a clear and unequivocal contract "'because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not

assented.'" Id. at 1195-96 (quoting Hallowell v. State Farm Mut. Auto. Ins. Co., 443 A.2d 925, 926 (Del. 1982)).

"A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." Rhone-Poulenc, 616 A.2d at 1196. "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." Id.

Under the Plan, a participant is entitled to benefits if "the Surviving Entity terminates the Participant's employment during the Protection Period" for grounds other than cause. Plan, §3.1 (emphasis supplied). This language clearly indicates that termination of employment by the employer is required to qualify for benefits under this section. No reference is made in this section to constructive discharge or the termination of employment by the employee due to adverse employment actions by the employer.

In contrast, §3.2 provides that a "Participant may terminate employment with the Surviving Entity during the Protection period with the right to severance benefits" only in two circumstances: (a) a reduction in the participant's base salary, or (b) the assignment of the participant to a new principal work location over fifty miles away. Plan, §3.2(a) and (b). These two circumstances fall within the class of adverse employment actions which might arguably support a constructive discharge. Logic dictates that if severance benefits were to be made available following employee resignations in response to other types of adverse actions by the employer, those actions would have been listed here. Significantly, §3.2 makes no reference to any other type of adverse employment action by the employer.

The doctrine of <u>expressio unius est exclusio alterius</u>, used as a tool of contract interpretation, provides that where specific items are listed in a document such as a contract, any item not so listed is typically thought to be excluded. <u>See</u> <u>Smart v. Gillette Co. Long-Term Disability Plan</u>, 70 F.3d 173, 179 (1st Cir. 1995)(applying doctrine to ERISA claim, and holding that plaintiff was not entitled to long-term disability benefits where such benefits were not listed in severance agreement); <u>see</u> <u>also</u> <u>Seidensticker v. Gasparilla Inn, Inc.</u>, No. 2555-CC (unreported), 2007 WL 4054473 (Del.Ch. Nov. 8, 2007)(applying doctrine to contract dispute). The fact that only two types of adverse employment actions are listed in §3.2 indicates that the drafters of the Plan intended to exclude resignations due to other types of adverse employment actions as a basis for severance benefits.

Regardless of whether this court were to apply a discretionary standard of review of the Appeal Committee's decision or the heightened <u>de</u> <u>novo</u> standard, <u>see</u> <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), the Appeal Committee's interpretation of the Plan was the only reasonable interpretation as a matter of law. In light of the plain and clear language of the Plan, plaintiff has failed to state a claim under §1132(a)(1)(B) which would entitle him to relief, and defendants' motion to dismiss Count 3 is granted.

IV. Count 4 – §1140 Claim

Plaintiff alleges that defendants engaged in coercion, harassment and discrimination against him with the purpose of interfering with his attainment of ERISA benefits and with the purpose of retaliating against him for engaging in protected activities in violation of 29 U.S.C. §1140. Complaint, ¶¶ 86-87.

Section 1140 of ERISA provides:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]

§1140.

This provision of ERISA is "aimed primarily at preventing unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." West v. Butler, 621 F.2d 240, 245 (6th Cir. 1980). Section 1140 "offers protection against two types of conduct: adverse action taken because a participant availed himself of an ERISA right (an "exercise" or "retaliation" violation), and interference with the attainment of a right under ERISA (an "interference" violation)." Coomer v. Bethesda Hospital, Inc., 370 F.3d 499, 506 (6th Cir. 2004). To state a claim under §1140, the plaintiff must show that an employer had a specific intent to violate ERISA., see Hamilton v. Starcom Mediavest Group, Inc., 522 F.3d 623, 628 (6th Cir. 2008); Smith v. Ameritech, 129 F.3d 857, 865 (6th Cir. 1997), and requires that the discrimination or other adverse job action "affect the individual's employment relationship in some substantial way." West, 621 F.2d at 245-46.

In the absence of direct evidence, courts apply the burden-shifting approach utilized in Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981). Hamilton, 522 F.3d at 628. The elements of an interference claim under §1140 are (1) that there was prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the

employee may become entitled.  *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444, 455 (6th Cir. 2003).

Plaintiff alleges that defendants engaged in conduct prohibited under ERISA with the purpose of interfering with his receipt of severance benefits.  Plaintiff alleges that he was assigned to three branches, two of which were in depressed areas, and that he was unable to meet his loan quota.  Complaint, ¶¶ 25-26.  He was given formal warnings and ultimately placed on probation due to his failure to meet his loan goals.  Complaint, ¶¶ 27, 29-30, 32, 45-46.  Plaintiff does not allege in the complaint that he was in fact meeting his goals, or that the probation was unwarranted.  In fact, it is stated in the complaint that plaintiff acknowledged on January 15, 2010, that he was not meeting the terms of his probation.  Complaint, ¶ 47.  Instead, plaintiff complains that he was not put on probation until December 10, 2009, that he was not terminated in a timely manner after he failed to meet the terms of his probation, and that his supervisors kept rescheduling meetings concerning the status of his probation.  Complaint, ¶¶ 44-49.  When his termination was not forthcoming, plaintiff resigned on January 29, 2010.

Thus, the main gist of plaintiff's complaint is that PNC interfered with his right to severance benefits because PNC did not terminate his employment during the protection period, where termination by PNC would have made him eligible to receive severance benefits.  However, PNC had no obligation under ERISA to terminate plaintiff's employment; rather, PNC could elect instead to keep plaintiff on its payroll for the duration of the protection period.

As a matter of law, keeping plaintiff on the payroll did not

constitute an adverse employment action and was not conduct prohibited under ERISA. See Garavuso v. Shoe Corps. of America Industries, Inc., 709 F.Supp. 1423, 1432 (S.D.Ohio 1989), aff'd 892 F.2d 79 (6th Cir. 1989)(extending plaintiff's layoff date and keeping him on payroll past date he would have been eligible for severance pay not an adverse job action under §1140); see also Bodine v. Employers Casualty Co., 352 F.3d 245, 250-51 (5th Cir. 2003)(employer's failure to terminate employees did not constitute discrimination or unscrupulous conduct required for §1140 action); Curby v. Solutia, Inc., 351 F.3d 868, 872 (8th Cir. 2003)(employee cannot submit a resignation and then claim the employer's acceptance of the resignation is an adverse employment action); Perdue v. Burger King Corp., 7 F.3d 1251, 1255 (5th Cir. 1993)(prohibitions under §1140 do not extend per se to an employer who retains an employee so as to avoid payment of severance benefits under an ERISA plan); Varhola v. Doe, 820 F.2d 809, 816-17 (6th Cir. 1987)(decision to retain some employees while allowing others to retire with shutdown pensions is not prohibited conduct under §1140); Stout v. Bethlehem Steel Corp., 957 F.Supp. 673 , 695 (E.D.Pa. 1997)("Offering a job, or the chance to continue employment, has never been prohibited employer conduct, and it would be a ludicrous distortion of ERISA to make it so.").

Plaintiff also alleges that on two occasions in August of 2009, his supervisors requested that he voluntarily retire from his employment with PNC, but that plaintiff refused to do so. Complaint, ¶¶ 31, 33. Plaintiff informed his supervisors that it was his opinion that if his employment was terminated, he would be entitled to severance benefits. Complaint, ¶ 31. Plaintiff does not allege that his resignation, which occurred much later on

23

January 29, 2010, was in any way related to or coerced by these requests.  The record includes a letter dated September 1, 2009, from plaintiff's counsel, in which counsel alleges that "National City apparently wishes to force Mr. Caldwell to retire after his lengthy and successful career with the company" and advocating that plaintiff receive severance benefits.  Doc. 7, Ex. G.  John R. Johnson, Chief Counsel for PNC, responded by letter dated October 9, 2009, (prior to plaintiff's resignation in January of 2010) in which he stated that "we disagree with your contention that he was forced to retire, and both your subsequent letters and his continued employment bear out our position in that regard."  Doc. 7, Ex. H.  Plaintiff also alleges in his complaint that PNC kept putting off meetings concerning plaintiff's performance issues and did not terminate his employment.  Complaint, ¶¶ 47-49.  The facts alleged in the complaint suggest that plaintiff decided to resign within the protection period and rely on his constructive discharge argument as a basis for his claim to benefits when it appeared that PNC was not going to terminate his employment.  The complaint is devoid of any facts sufficient to state a claim that plaintiff's resignation was coerced by the defendants.

Plaintiff claims that his resignation constituted a constructive discharge which was sufficient to constitute a "discharge" under §1140.  Even assuming that the constructive discharge theory may apply to a claim under §1140, the complaint fails to allege facts showing that the defendants engaged in prohibited conduct under ERISA which created intolerable working conditions, as perceived by a reasonable person, with the intention of forcing plaintiff to quit.  See Logan v. Denny's, Inc., 259 F.3d 558, 568-69 (6th Cir. 2001).

The complaint also fails to allege facts sufficient to show that plaintiff had any right to expect severance benefits under the Plan. At the time of plaintiff's resignation, he had no vested right to severance benefits with which the defendants could interfere. <u>Perdue</u>, 7 F.3d at 1255. He could only become entitled to benefits if his employment was terminated by PNC without cause, or if he resigned because of a reduction in base salary or relocation of his principle job location. None of these events had occurred at the time of plaintiff's resignation. As indicated above, resignation due to some other action by PNC was insufficient under the plain terms of the Plan to constitute a termination which would entitle plaintiff to severance benefits. PNC was not obligated under the terms of the Plan or under ERISA to terminate plaintiff's employment during the protection period. Plaintiff has failed to allege sufficient facts to support an interference claim under §1140.

Plaintiff also alleges that the defendants engaged in retaliatory conduct in response to plaintiff's protected activity under ERISA. To establish a prima facie case of retaliation under §1140, the employee must show that (1) he was engaged in activity that ERISA protects; (2) he suffered an adverse employment action; and (3) a causal link exists between the protected activity and the employer's adverse action. <u>Hamilton</u>, 522 F.3d at 628. If plaintiff establishes a prima facie case, the burden shifts to defendants to articulate a legitimate reason for the adverse employment action. The employee must then show that the articulated reason was a pretext for retaliation. <u>Id.</u> Efforts to seek benefits are protected activities. <u>Id.</u>

Plaintiff alleges in conclusory fashion that from September 1,

2009 through January 29, 2010, he engaged in protected activity by corresponding with his supervisors, Don Guilbert and Ron Byers, with Mr. Johnson, and with Sally Weinkam, Human Resources Officer for PNC, regarding the status of plaintiff's employment, plaintiff's disparate treatment, and PNC's interference with plaintiff's rights under the Plan. Complaint, ¶ 43. The record does include the September 1, 2009, letter from plaintiff's counsel stating that benefits under the Plan were "appropriate" in plaintiff's case. Mr. Johnson responded in his letter of October 9, 2009, that since plaintiff had not been terminated, his salary had not been reduced, and his job location had not been moved, he was not entitled to benefits under the Plan "at this time." Doc. 7, Ex. H. The mere expression of the correct opinion that plaintiff was not entitled to benefits under the Plan because his employment had not been terminated was not an adverse action under §1140.

Plaintiff does not specifically allege in the complaint which conduct on the part of the defendants was in retaliation for this expression of an interest in benefits. Three months after this letter was sent, plaintiff was placed on probation. However, in light of his acknowledged failure to meet his loan goals, he does not allege in the complaint that this probation was unwarranted. In fact, he alleges that PNC should have terminated his employment for failure to meet the terms of his probation. Complaint, ¶ 47. Thus, the main gist of plaintiff's retaliation claim also appears to be that PNC retaliated against him for seeking benefits under the Plan by failing to terminate his employment. However, the refusal to terminate plaintiff's employment does not qualify as an adverse employment action. Plaintiff has failed to allege

sufficient facts to support a retaliation claim under §1140.

Defendants also argue that plaintiff's §1140 claim should be dismissed because it would not afford plaintiff the relief that he seeks. Section 1140 is enforced through 29 U.S.C. §1132(a)(3), which authorizes a civil action by a participant "to obtain other appropriate equitable relief" to redress the §1140 violations. Alexander v. Bosch Automotive Systems, Inc., 232 Fed.Appx. 491, 496 (6th cir. 2007). The term "equitable relief" refers to "those categories of relief that were typically available in equity." Mertens v. Hewitt Assocs., 508 U.S. 248, 256 (1993). Traditional equitable remedies include certain kinds of injunctions and restitution, but not compensatory damages, which are "the classic form of legal relief." Id. at 225. An injunction to compel the payment of money past due under a contract or specific performance of a past due monetary obligation was typically not available in equity. Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 210-11 (2002). Suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for "money damages." Id. at 210; see also Alexander, 232 Fed.Appx. at 496-502 (plaintiffs could not recover plant closure benefits under §1140 since the relief sought was not the type of traditional equitable relief authorized under §1132(a)(3). Back pay is also a legal remedy not available under §1132(a)(3). Millsap v. McDonnell Douglas Corp., 368 F.3d 1246, 1252-60 (10th Cir. 2004).

In his complaint, plaintiff requests a declaration that he was constructively discharged and that defendants violated the terms of the Plan by refusing to pay him severance benefits. He also requests an order directing defendants to pay him benefits under

the Plan.  Although he does not assert a claim for back pay in his complaint, he argues in his memorandum contra the motion to dismiss that he is also seeking back pay.  However, the benefits he seeks all amount to money damages in the form of severance payments under the Plan.  The relief plaintiff seeks is not available for a §1140 violation, as enforced through §1132(a)(3).

For the foregoing reasons, the allegations in the complaint fail to state a claim for relief under §1140, and defendants' motion to dismiss that claim is well taken.

V. John Doe Defendants

In regard to Count 2, the court notes that this claim is asserted against PNC, and does not specifically name the Plan, defendant Allen or the John Doe defendants as parties to that count.  Accordingly, the John Doe defendants and defendant Allen will be dismissed as parties to this action.[4]

VI. Conclusion

In accordance with the foregoing, defendants' motion to dismiss Counts 1, 3, 4 and 5 of plaintiff's complaint is granted, and those counts are hereby dismissed.  In accordance with this order, defendants National City Corporation Amended and Restated Management Severance Plan, Kerry Allen, and the John Doe defendants are hereby dismissed as parties on all of plaintiff's claims.

Date: December 19, 2011          _____s/James L. Graham_____
                                 James L. Graham
                                 United States District Judge

_____

[4] The court also notes that on August 24, 2011, the magistrate judge issued an order for plaintiff to show cause why the John Doe defendants should not be dismissed without prejudice under Rule 4(m) for failure to obtain service, and plaintiff has not responded to that order.  Accordingly, dismissal of the John Doe defendants is warranted on this ground as well.